

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2012 FEB 23  PM 3: 50

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

RUSS M. HERMAN AND ARNOLD LEVIN,

                **Plaintiffs,**

v.

CATAPHORA, INC. AND ROGER
CHADDERDON,

                **Defendants.**

                          /

CASE NO.: **12 - 0497**

SECT. L MAG 2

**SECT. N MAG. 1**

**COMPLAINT**

**JURY TRIAL DEMAND**

### COMPLAINT

    Plaintiffs, Russ M. Herman and Arnold Levin ("Plaintiffs"), Court appointed Plaintiffs'

Liaison and Lead Counsel, respectfully, in the Chinese Manufactured Drywall Litigation,

complain and allege against Cataphora, Inc. ("Cataphora") and Roger Chadderdon

("Chadderdon") (collectively "Defendants") as follows:

### JURISDICTION, PARTIES, AND VENUE

    1.  Original jurisdiction of this Court exists by virtue of 28 U.S.C. §1332(d)(2).  The

Plaintiffs and Defendants in this action are citizens of different states and the amounts in

controversy in this action exceeds seventy five thousand dollars ($75,000.00), exclusive of

interest and costs.

    2.  Defendants are subject to personal jurisdiction in this Court since they contracted to

provide litigation support services in MDL 2047.  Defendants are also subject to personal

1

Fee $350.
Process ___
X Dktd ___
CtRmDep ___
Doc. No. ___

jurisdiction in this Court since they directed their defamatory statements towards this forum with the hope of harming Plaintiffs' standing before prospective jurors in the Chinese manufactured drywall litigation and conducted activities in the Eastern District of Louisiana.

3. Venue in this district satisfies the requirements of 28 U.S.C. §1391(a)(2) because one of the Plaintiffs resides in this jurisdiction and a substantial amount of the events and occurrences giving rise to these claims occurred in this District. Venue is otherwise appropriate in this district consistent with 28 U.S.C. § 1407 and the June 15, 2009 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML"). *See In re: Chinese-Manufactured Drywall Products Liability Litigation*, 626 F.Supp.2d 1346 (J.P.M.L. Jun. 15, 2009).

## PLAINTIFFS

4. Plaintiff Russ M. Herman is the Court appointed Liaison Counsel in MDL 2047. Mr. Herman is an ex-officio member of the Plaintiffs' Steering Committee ("PSC") in MDL 2047. Mr. Herman is a resident of New Orleans, Louisiana.

5. Plaintiff Arnold Levin is a member of the Court appointed PSC in MDL 2047. The Court has appointed Mr. Levin as lead counsel of the PSC. Mr. Levin is a resident of Philadelphia, Pennsylvania.

## DEFENDANTS

6. Defendant Cataphora is a corporation organized and existing under the laws of the State of California, with its principal place of business in Redwood City, California. Cataphora is a vendor that provides litigation support and document retrieval services.

7. Defendant Chadderdon is a principal of Cataphora. Chadderdon is a resident of California.

2

## FACTS

8. Beginning in April 2009 and through June 2009, Cataphora centered its focus of business activities (through defendant, Chadderon, a principal and fiduciary), on the United States District Court for the Eastern District of Louisiana. See Exhibit "B" hereto.

9. Defendants sought a contract in New Orleans with either attorneys representing the Knauf Defendants, the Frilot Firm; or Greenberg Traurig law firm, representing builders; or with attorneys Herman and Levin who were appointed to represent thousands of consumers. See Exhibit "B" hereto.

10. Defendants approached the Frilot firm and were directed to get their [expletive deleted] in gear in New Orleans. They considered the "real prize" to be the PSC representing consumers and first concentrated efforts on Herman and his Firm. See Exhibit "B" hereto.

11. On more than one occasion, Defendants stated that "if plaintiffs [Herman and Levin] would not sign with Cataphora", Cataphora would assist the defendants in MDL 2047! See Exhibit "B" hereto.

12. By September 2009, Cataphora and Chadderon criticized the Defense team in MDL 2047 by stating Frilot did not have much knowledge and disparaged plaintiff lawyers as untrustworthy. Nevertheless, Defendants ordered "a smart person" to New Orleans to "close a deal" with the Court appointed PSC. See Exhibit "B" hereto.

13. By June 2009, Defendants' investigation in New Orleans revealed that "Frilot, a tiny firm" had retained MAGNA, a competitor. And on June 27, 2009, Chadderon and others were dispatched to New Orleans to make a full court press on the Plaintiffs' Steering Committee leaders Levin and Herman. See Exhibit "B" hereto.

3

14. Plaintiffs here, Herman and Levin, operated not only as leaders of the PSC, but also functioned as ethics ombudsmen.

15. The PSC and Defendants eventually entered negotiations for Cataphora to provide litigation support services in MDL 2047. Throughout the months of August and September 2009, on more than a dozen occasions, Cataphora and Chadderdon inserted a "success fee" in various submitted contracts with fees they considered to be "gravy." See Exhibit "B" hereto.

16. Russ Herman, after conferring with Arnold Levin, continuously rejected all "success fees" on the basis that the Ethics and Professional Codes of most states and the prevailing professionalism in the Eastern District characterized success fees as a disguised sharing of legal fees with non-lawyers. Further, that any "success fee" contract provision would have to be presented to the presiding Judge as it ultimately would be a detriment to the Class of consumers and on its face was unethical. Indeed by the end of September 2009 Cataphora and Chadderdon, defendants here, clearly understood that neither Herman nor Levin would approve a contract with a "success fee".

17. The PSC and Defendants eventually reached a tentative agreement for Cataphora to provide litigation support services in MDL 2047. The last contract submitted to Herman and Levin contained a "success fee" and a "non-refundable lump sum fee". This contract was invalid since it contained an illegal fee provision. Additionally, the contract was unenforceable since there was no meeting of the minds with respect to the success fee and the non-refundable fee provisions.

18. The contract between the PSC and Cataphora was fully executed by all parties on October 6, 2011.

4

19. Plaintiffs terminated the illegal and invalid contract shortly after execution when the success fee was discovered and certainly within 30 days of its execution consistent with the contractual terms governing termination. On October 16, 2009 and again on October 21, 2009 Herman and Levin advised Defendants, Cataphora and Chadderdon, that they would not contract with Cataphora and would neither pay a "non-refundable", nor a "success fee". The District Court in California found the "non-refundable fee" illegal.

20. Notwithstanding these facts, Defendants filed suit for breach of contract in the United States District Court for the Northern District of California and obtained a judgment against Plaintiffs on September 19, 2011. Defendants also obtained an award of attorneys fees and interest on January 4, 2012. Plaintiffs are appealing the judgment as well as the award of attorneys fees and interest to the Ninth Circuit Court of Appeals.

21. After the contract issues were litigated in California, Chadderdon and Cataphora sought to damage the reputations of Levin and Herman among their peers, members of the PSC, the Judiciary, and Defense Counsel. Herman and Levin have national reputations as stalwart litigators and have brought justice to hundreds of thousands of consumers and accomplished millions of dollars in "pro bono work".

22. Shortly after the judgment was awarded to Cataphora, Chadderdon made a series of defamatory statements about the Plaintiffs which were published over the internet on or about September 26, 2011. A website, Abovethelaw.com, quoted Chadderdon as making the following statements concerning the Plaintiffs which have been published and are now available to the Plaintiffs' clients, prospective clients, members of the legal community, and the public:

> "These guys are the worst of hypocrites that you can possibly find
> ... They claim to be trying to help the little guy, but what they're

5

doing is trying to put more money in their own pockets. Everyone knows that, but this is a case that illustrates it beyond what I have ever seen."

A copy of the above statements by Chadderdon, as they appear on abovethelaw.com, is attached hereto as Exhibit "A".

23. In this same publication, Chadderdon contends that the Plaintiffs told Cataphora, "Sue us if you dare." *See* Exhibit "A" hereto.

24. The personal attacks on Herman and Levin by Chadderdon and Cataphora were uncalled for. These attacks have thus far sought to undermine the leadership of the PSC, and were intended to do so.

25. The defamatory statements by Chadderdon are both false and defamatory. Chadderdon made the defamatory statements orally to a reporter with the intent that the defamatory statements would be published on the internet.

26. The statements by Chadderdon are defamatory since they have injured Plaintiffs' personal and professional reputations, and have caused personal humiliation, embarrassment and mental anguish. The statements have lowered Plaintiffs in the estimation of the community, deterred others from associating or dealing with Plaintiffs and/or otherwise exposed Plaintiffs to contempt or ridicule. The statements also convey elements of personal disgrace, dishonesty, and disrepute.

27. The false and defamatory statements by Chadderdon were malicious since Defendants either knew the statements were false or acted with reckless disregard for the truth.

28. Upon information and belief, the defamatory statements by Chadderdon were made within the scope of his agency for Cataphora.

6

29. Alternatively, the defamatory statements by Chadderdon were made outside the scope of his agency for Cataphora and he should be subject to personal liability.

30. The defamatory statements by Chadderdon were intended to and have tainted potential jury pools in future cases involving Chinese manufactured drywall. Since the publication on abovethelaw.com is national in scope, Chadderdon's defamatory statements are likely to taint jury pools in all jurisdictions where Chinese drywall cases are transferred/remanded following the dissolution of MDL 2047. Accordingly, the scope of the damage and injury to Plaintiffs is national in scope.

31. Additionally, since the publication on abovethelaw.com is national in scope, the defamatory statements by Chadderdon are likely to harm Plaintiffs in future litigations that are totally unrelated to MDL 2047. For instance, the statements by Chadderdon are likely to adversely impact the Plaintiffs' standing in jury trials in unrelated matters. Further, the defamatory statements by Chadderdon have harmed Plaintiffs' standing in the legal community and are likely to impact their ability to secure executive roles in future MDL litigations. Chadderdon's statements are also likely to adversely impact Plaintiffs' reputations in their home communities.

32. In addition to the above defamatory statements by Chadderdon, Chadderdon has also contacted a prominent member of the Defendants' Steering Committee ("DSC"), Kerry Miller, and has offered to provide valuable insights about the Plaintiffs and their litigation strategies. See exhibit "C". This effort to contact a member of the DSC was made with malicious intent to interfere with ongoing settlement negotiations. Defendants' defamatory statements, as set forth in paragraphs 22 and 23 above, were also made with malicious intent to interfere with ongoing

settlement negotiations.

33.  Plaintiffs had a reasonable expectation of economic advantage or benefit in the form of a global settlement of the Chinese manufactured drywall litigation.

34.  Defendants had knowledge of this expectation of economic advantage or benefit on the part of Plaintiffs and wrongfully and without justification interfered with this expectation as set forth in paragraph 32 above.

35.  Plaintiffs have sustained damages as a result of Defendants' interference with their reasonable expectation of economic advantage or benefit.

36.  Discovery is likely to reveal other similar communications by Chadderdon.

37.  At the time Defendants' maliciously sought to interfere with the reputations of Plaintiffs, Plaintiffs' MDL Liaison Counsel (Herman), and Plaintiffs' Lead Counsel (Levin) were engaged in intense, contentious and protracted negotiations with Kerry Miller, Esq., Defendants' Liaison Counsel and counsel for Knauf, and other Knauf attorneys and corporate principals.

38.  Subsequently, settlement of a class action on behalf of thousands of claimants was preliminarily approved in a high 9-figure dollar amount.  Contrary to Defendants' assertions, **no claimant** in that settlement is responsible for attorney fees.  These settlement discussions were interrupted because of Defendants' intentional attacks and no doubt settlement was off track for a period of time.  At the time of the vindictive attacks by Defendants, Plaintiffs were unable to explain their actions vis-à vis Cataphora because the presiding Magistrate Judge in California had under consideration trial issues and because a public explanation would have endangered settlement opportunities.  The litigation continues against the Chinese companies and depositions were recently taken in Hong Kong with the MDL Judge – the Honorable Eldon E. Fallon

8

presiding.

39.  Plaintiffs are also members of the court appointed Plaintiffs' Steering Committee in MDL 1355 (Propulsid).  Plaintiffs' firms in MDL 1355, during a contemporaneous period of time, successfully negotiated a Cy Pres of more than $8,000,000.00 for medical services for the New Orleans community post Hurricane Katrina.

**COUNT I**
**DEFAMATION**
**(Against All Defendants)**

40.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

41.  The statements by Defendants are both false and defamatory.

42.  The statements by Defendants are defamatory since they will tend to harm the reputation of Plaintiffs so as to lower Plaintiffs in the estimation of the community, deter others from associating or dealing with Plaintiffs and/or otherwise expose Plaintiffs to contempt or ridicule.  Further, the statements are defamatory since they convey elements of personal disgrace, dishonesty, or disrepute.

43.  The defamatory statements by Defendants are both slanderous and libelous.  The statements are slanderous since they were made orally to a reporter.  The statements should also be considered libelous consistent with the Restatement (Second) of Torts § 568 comment f, since they were made to a reporter with the intent that they would be published on the internet.

44.  The statements by Defendants are defamatory per se such that falsity, malice and injury should be presumed since by their very nature they tend to injure the Plaintiffs' personal and professional reputations.

45.  No privilege applies which would excuse Defendants from liability for publication of

9

the false and defamatory statements to third parties.

46. Defendants publication of the defamatory statements to third parties was malicious since Defendants either knew the statements were false or acted with reckless disregard for the truth.

47. The defamatory statements by Defendants were designed to harm Plaintiffs in their professional standing in the legal community and before jurors throughout the country. The defamatory statements by Defendants were also designed to harm Plaintiffs standing in their home communities.

48. Plaintiffs have experienced both nonpecuniary and general damages such as injury to their reputations, personal humiliation, embarrassment and mental anguish. Plaintiffs have also experienced special damages in the form of lost income deriving from damage to their professional reputations.

49. As a direct and proximate cause of Defendants' false and defamatory statements, Plaintiffs have been harmed and have incurred damages as described herein.

**COUNT II**
**INTERFERENCE WITH PROSPECTIVE ADVANTAGE**
**(Against All Defendants)**

50. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

51. Defendants interfered with a reasonable expectation of economic advantage and benefit on the part of the Plaintiffs.

52. Plaintiffs had a reasonable expectation of economic advantage or benefit in the form of a settlement of the litigation in MDL 2047. Plaintiffs reasonably expected they would be able to negotiate settlements of all Chinese manufactured drywall claims with the major

10

manufacturing defendants, the major distributers/suppliers, the major builder/developers, and the insurance companies that provided coverage for these parties.

53. Although Plaintiffs have succeeded in settling with some of the major defendants in the Chinese manufactured drywall litigation, Defendants conduct has thus far limited Plaintiffs' ability to reach a global settlement with all major defendants. However, a settlement was reached with Kanuf.

54. Defendants had knowledge of Plaintiffs' expectation of economic advantage or benefit.

55. Defendants wrongfully and without justification interfered with Plaintiffs' reasonable expectation of economic advantage or benefit.

56. In the absence of the wrongful acts of Defendants, it is reasonable probable Plaintiffs would have realized its economic advantage or benefit.

57. Plaintiffs sustained damages as a result of this activity by Defendants.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand upon Defendants jointly and severally for:

   a.    compensatory and damages;

   b.    punitive damages as allowed by law;

   c.    pre and post-judgment interest as allowed by law;

   d.    an award of attorneys' fees as allowed by law;

   e.    an award of taxable costs; and

   f.    any and all such further relief as this Court deems just and proper.

11

Respectfully submitted,

Dated: February 23, 2012      By: _____

Russ M. Herman
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Pro se

By: _____

Arnold Levin
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Pro se

12